THE PEOPLE OF THE STATE OF NEW YORK ex rel. MARY C. WARD and Others, as Executors, etc., of ROBERT B. WARD, Deceased, Respondents, *v.* GEORGE W. SUTTON, as Commissioner of Assessment and Taxation of the City of New Rochelle, and Others, Appellants.

Second Department, February 28, 1919.

Tax — valuation of estate near city of New Rochelle — evidence — admissibility of original papers in prior transfer tax proceeding — evidence as to cost of improvements.

Upon a review of the proceedings of the commissioners of assessment and taxation of the city of New Rochelle fixing the valuation of an estate in the outskirts of said city, it was error for the referee to exclude original papers in a prior transfer tax proceeding fixing the value of said estate, especially where the expert employed in such proceeding by the present relators upon his examination before the referee testified to a different valuation than that stated in said papers.

Under the circumstances evidence as to the cost of improvements upon which the owner had recently spent not less than $200,000 should have been received.

As a general rule improvements add to the value at least their structural cost.

APPEAL by the defendants, George W. Sutton, as commissioner, and others, from an order of the Supreme Court, made at the Dutchess County Special Term and entered in the office of the clerk of the county of Westchester on the 16th day of September, 1918, reducing the assessment of certain lands belonging to the relators in the city of New Rochelle upon the assessment roll of 1916 from the sum of $206,100 to the sum of $162,563.

The facts, outside of the estimates of value given by the opposing expert witnesses, are undisputed, and may be briefly summarized as follows: In 1911 the testator purchased a farm upon the Quaker Ridge road (so called) in the outskirts of the city of New Rochelle. That locality is a ridge running from Mamaroneck on the Sound at the east into Scarsdale at the west, bordering upon the outer limits of New Rochelle. The land upon the ridge is high and commands a fine prospect of the Sound to the south and east, and of a very attractive

rural territory in other directions. For at least twenty years or more the locality has been a favorite site for the creation by wealthy New Yorkers of fine country estates out of the old farms. Some ten years ago or thereabouts the New York, Westchester and Boston railroad was opened through the westerly part of the territory, affording ready access to New York city. The mansion house upon this tract is situated about three-quarters of a mile from one of the stations of that road.

Mr. Ward in 1911 paid for the farm (some fifty-eight and a fraction acres) at the rate of $1,900 an acre, making in all the price of $110,200. The farm buildings then were old and evidently of no special value. He died October 18, 1915, having in the interim constructed upon the land very extensive improvements, making of it his own home. The farm is divided by the Quaker Ridge road, so that about forty-nine acres lie upon the south side and nine acres upon the north side of it. Upon the south he constructed a very fine mansion, large greenhouse, chicken house, piggery, milk house and barn all thoroughly equipped to the very last degree, and also improved the land with drainage and shrubbery, sunken gardens, etc. Upon the other, the north parcel, he constructed a large garage and, removing the old farmhouse from the other parcel, renovated it. While the record, although very extensive, does not show the actual cost to him of those improvements, it fairly indicates that they did not cost less than $200,000.

In the fall of 1916, about one year after the testator's death, the New Rochelle assessors assessed the property in two tracts, viz., the south parcel, land $79,200, improvements $83,300, total $162,500; the north parcel, land $18,600, improvements $25,000, total $43,600; total for both parcels, $206,100. The relators, the executors of his will, being thereunder seized or in control of the property, duly filed with the assessors their complaint and protest, claiming that the entire assessment should be reduced . to $129,000. The assessors refused that request and the relators took this certiorari proceeding to review their such action, claiming the assessments to be erroneous for two reasons: (1) Overvaluation to the extent of $56,100; and (2) unequal assessment

as compared with other parcels in the city generally. The assessing officers of the city made due return to the writ and asserted therein the validity of their such action. The court at Special Term, on June 21, 1917, made order of reference in the usual form. At the beginning of the hearings before the referee it was stipulated that in order to make the assessment of relators' property correspond with that of other property upon the same roll, it should be assessed at eighty-five per cent of its market value. This would indicate that the assessors adjudged the full value of the property to be $242,353.

The referee took a great amount of evidence, which consisted, however, almost entirely of the opinions of a group of three expert witnesses for the relators and three for the defendants. The former group valued the entire tract at about $150,000, the variance between them being less than $5,000. Their valuation was, for the south parcel, land about $64,000, improvements about $64,000; and for the north parcel, land $9,000 and improvements about $13,000. The other group, those for the defendants, valued the entire tract at about $300,000, with, however, a much larger variance, that is, of about $40,000. Their valuation was, for the south parcel, land about $123,000, improvements $118,000; for the north parcel, land $18,600, and improvements $13,500. The referee adopted somewhat of a medium course as between the two groups and fixed the values as follows: South parcel, land $74,250, improvements $81,250, total $155,500; north parcel, land $13,950, improvements $21,800, total $35,750; total for both parcels $191,250, and, upon the stipulation made at the opening and above recited, reduced the assessment to, for the south parcel $132,175, for the north parcel $30,388, and for both a total of $162,563.

*William L. Moran [Walter G. C. Otto, Corporation Counsel, with him on the brief], for the appellants.*

*Walter H. Young, for the respondents.*

Per Curiam:

Although, from reading the record, we are inclined to give more weight to the opinion of the group of expert witnesses for the defendants, and although it is quite evident that

the group for the relators were mistaken in their opinion as to several leading recent sales in the general locality, which they used as bases for judgment, we would feel required by the settled rules governing our determination in such cases to sustain the conclusion of the referee, confirmed as it has been by the court at Special Term, were it not for two undisputed facts appearing in the record, which are of great force and do not appear to us to have been duly considered either by the relators' experts, the referee or the Special Term. The first of those two important, undisputed facts is that in October, 1916, the relators took the usual proceedings to have the State death transfer tax upon the estate determined, and therein presented to the transfer tax appraiser of Westchester county the affidavit of an expert selected by them, which gave the value of the property at $275,000; and their application based thereon for the fixing of the tax upon that basis was filed in the office of the clerk of the Surrogate's Court on May 3, 1917, and the tax fixed accordingly, and no appeal was taken. Indeed the leading relator here made in that proceeding his own affidavit to that valuation as of October 18, 1915, the date of death. The original papers in that proceeding were produced from that office and offered in evidence by the defendants' counsel and appear to have been excluded by the referee, mistakenly, as we think. The expert so employed by the relators was examined before the referee by counsel for defendants, and testified that upon that employment he, in October, 1916, valued the property at $236,000. Here again the referee excluded the affidavit in the transfer tax proceeding. According to the expert's testimony the valuation then placed was $236,000, whereas, according to the testimony of the executor, the valuation given by him was $275,000. If the papers themselves had been received in evidence, this discrepancy might not appear. Here, now, we have this very anomalous condition, namely, that at the relators' own application and suggestion the value of the property at the death of the testator, on October 18, 1915, was for the purpose of the State death transfer tax fixed at $275,000, or, giving the respondents the benefit of the discrepancy, at $236,000, whereas the referee and the Special Term have fixed that value one year later at $191,250. Evidently there is something wrong somewhere.

We think that the transfer tax proceedings, being the voluntary action of the relators, should have been received in evidence against them, and that if they had demonstrated what the proofs indicate they would, they would have made the weight of the evidence sustain the valuation of the assessors.

The second important undisputed fact referred to above is that it is plain from the proofs that during the four years (1911 to 1915) the testator spent not less than $200,000 in improving the property, which, with the initial cost of the farm in 1911, $110,200, made the cost of the property, all incurred within a comparatively brief time before the assessment, exceed $300,000. There is nothing in the evidence or in our common knowledge to indicate that in the year between the death of the testator and the assessment there had been any general depreciation in the value of such property in that locality. Indeed, we have in many instances in other cases sustained a finding that the new railroad through that locality has tended to a general enhancement of values. Moreover, there is no pretense even that the improvements made by Mr. Ward upon the property were out of proportion to such an estate in that neighborhood. This much the leading expert for the relators admitted, except that he claimed that the dairy barns had too much hay space for the extent of the mowing fields upon the tract. That expert, moreover, practically rejected the cost of the improvements as an element of weight in valuing the property, and the other experts for the relators followed his lead. Indeed, he admitted that he did not even inquire as to the cost, and he acted upon the general theory that " hardly ever does [*sic*] the improvements add to the price of the property it cost, that is never so." The contrary is clearly the general rule, namely, that improvements do add to the value at least their structural cost, although there may be instances where they do not, as where some rich man, Jones for instance, builds a mansion in an entirely inappropriate locality and it comes throughout the neighborhood to be known as " Jones' Folly." (*Matter of City of New York*, 198 N. Y. 84, 87.) We had a case of that exceptional sort before us a few years ago where, in a poor part of the city of Middletown, a man constructed at great expense a fine mansion utterly inappropriate to its

surroundings. (*Matter of Horton*, 170 App. Div. 949.) There is, however, in this record no evidence to warrant the inference that this is any such instance.

As to the estimate of the cost of the improvements as fully $200,000, above given, the evidence is far from satisfactory upon that subject. Although those expenses had so recently been incurred, no exact proof of them was made. Defendants' counsel called the leading executor as their own witness and attempted to prove by him the fact, but he evaded the matter, professing ignorance, which does not appear to be likely. We think that the estimate of $200,000 is conservative. We cannot doubt that the relators could have proved that cost had they desired to do so. It is inconceivable that a business man like the late Mr. Ward did not leave data from which the cost of those improvements, so recently made, and which evidently were the fad of his last three or four years, could not have been ascertained by his executors. We think that the referee and the Special Term should have been advised of that cost. Prices of building materials had, as matter of common knowledge, advanced materially during the interim.

Upon the whole we are not satisfied that the case has been fairly and fully tried. It seems to us that the weight of the evidence as it stands does not warrant any reduction of the assessment, and that there should be a new trial or hearing. It seems to us, moreover, that it would be well to have such new hearing before the official referee residing in the Ninth Judicial District.

The final order appealed from should be reversed and a new hearing directed, the same to be had before the Hon. Michael H. Hirschberg as official referee, with costs to abide the event.

JENKS, P. J., MILLS, PUTNAM, KELLY and JAYCOX, JJ., concurred.

Final order reversed and a new hearing directed before Hon. Michael H. Hirschberg, official referee, with costs to abide the event.